IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE**<br>　　Miami, Florida<br>　　and<br><br>**JANE DOE**<br>　　Atlanta, Georgia<br><br>　　Plaintiffs,<br><br>　　v.<br><br>**MERRILL LYNCH**<br>　　4 World Financial CTR<br>　　250 Vesey Street<br>　　New York, NY 10080<br><br>　　and<br><br>**BANK OF AMERICA CORPORATION;**<br>　　100 North Tryon St.<br>　　Charlotte, North Carolina 28202<br><br>　　Defendants. | Civil Action No. |

### COMPLAINT FOR NEGLIGENCE AND BREACH OF CONTRACT AGAINST DEFENDANT BANK OF AMERICA AND FOR NEGLIGENCE AND FALSE LIGHT AGAINST DEFENDANT MERRILL LYNCH

### INTRODUCTION

This action arises out of Defendant Bank of America (BofA)'s negligent conduct in unlawfully closing Plaintiff John Doe's account and that of his daughter, Jane Doe, and in Merrill Lynch's case, summarily rejecting Plaintiff's application to open an alternative investment account, and in the process starting an investigation of the Defendants' conduct, which led to BofA's closure

1

of Plaintiff's bank accounts. In doing so, both banks acted in an arbitrary and capricious manner, and breached the duty of good faith and fair dealing that each bank owed to the Plaintiffs.

This is an attempt by an experienced world diplomat to ascertain the reason why the banking relationship he had with BofA was summarily terminated even though he had an excellent 34-year banking record with them. The only reason Plaintiff has filed this lawsuit is BofA's adamant refusal to tell him the reasons why his account was closed. Not being able to explain why his account was terminated leads certain parties to speculate that he had engaged in or was complicit in money-laundering activities. Nothing could be further from the truth, as detailed herein.

The Defendants named herein have their principal place of business or active full-time operations or are incorporated in jurisdictions like North Carolina, New York, and Florida. Courts in all of these jurisdictions have issued favorable rulings regarding the rights of a bank customer when his account is terminated by his bank for unknown reasons. The length and nature of the relationship are important considerations in this regard.

Given the fact that Plaintiff had a 34-year unblemished association with BofA, these decisions would compel the conclusion that in discharging its obligation to deal with the Plaintiff fairly and in good faith, it should have provided the Plaintiff with an explanation as to why his bank account was summarily terminated. It obviously did not do so, leaving certain parties (like international conglomerates seeking the services of reputable board members like the Plaintiff) to speculate that the Plaintiff had engaged in or was complicit in money-laundering activities. Most bank accounts that are summarily shut down are done so for this very reason.

## JURISDICTION AND VENUE

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.

2. Venue is proper in this judicial district because both Defendants have physical locations in this judicial district and some of the acts complained of herein occurred in this judicial district.

**PARTIES**

3. Plaintiff John Doe is an American citizen domiciled in Florida and is a well-known international figure with a political background, having served as an appointee of foreign governments.

4. Plaintiff's daughter, Plaintiff Jane Doe, is an American citizen domiciled in Georgia, and like her father had her bank account at BofA closed down without explanation.

5. Defendant BofA is incorporated in Delaware with its principal place of business in North Carolina. It has engaged in banking activities in the United States for approximately 40 years.

6. Defendant Merrill Lynch is incorporated in Delaware with its principal place of business in New York. It has engaged in banking activities in the United States for approximately 40 years.

**STATEMENT OF FACTS**

7. Plaintiff had a noncommercial bank account with BofA for 34 years, and developed a solid banking relationship with its officers who serviced his needs and those of his daughter. They were both very satisfied with the excellent services provided to them during this lengthy period.

8. During that time, BofA officials had no issues with and never complained about how Plaintiff or his daughter conducted their banking affairs. There were no incidents of bounced checks or incidents of misdirected wire transfers, and no need to generate any Suspicious Activity Reports (SARs) in connection with activity in either account.

9. On March 23, 2015, Plaintiff received notice of his BofA account's closure, with no reason cited. Plaintiff Jane Doe also had her BofA account closed at the same time. She did not receive an explanation either as to why her account had been summarily closed.

10. After much difficulty, explaining, and frustration, Plaintiff John Doe was finally able to transfer his funds to J.P. Morgan Chase, where he now has an account.

## COUNT I: NEGLIGENCE AGAINST DEFENDANT BANK OF AMERICA

11. Plaintiffs repeat and reallege paragraphs 1 through 10 as though fully recited herein.

12. Based upon information and belief, during 2014, BofA received information, e.g., a newspaper clipping or an inquiry from the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) or another financial institution like Merrill Lynch. Based upon information and belief, that inquiry appeared to implicate Plaintiff in potential illicit activity. At no time did Plaintiff ever engage in any type of questionable behavior, let alone criminal activity.

13. BofA made no effort to inform Plaintiff about the accusations of illicit activity or suspect behavior. Nor did BofA undertake any investigation into the bona fides of these accusations by contacting the source of those accusations, for example, Merrill Lynch or FinCEN. Consistent with its responsibility to a customer who had a 34-year relationship with the bank, the bank should have immediately contacted him and investigated the matter in a comprehensive manner, including starting a dialogue with the source of the accusations, whether Merrill Lynch or some other entity, to ascertain the veracity of the allegations of misconduct made about him.

14. If the bank had done so, it would have concluded that the accusations were bogus in nature or made up for whatever reason, and would have had no further reason to suspect the Plaintiff or his daughter of any wrongdoing. Thus, there would be no basis for recommending the closure of

their bank accounts. Instead, BofA summarily and abruptly closed Plaintiff's account and that of his daughter. It did not explain the basis for such rash conduct or why it was urgent to take such remedial action. For example, a bank customer intent on fleeing the jurisdiction to avoid certain arrest and indictment for money laundering.

15. BofA owed the Plaintiff and his daughter a duty to act with reasonable care at all times. It should have, but it did not, conduct itself as a responsible banking institution concerned about the rights of individual account holders who: (a) had been unfairly accused of unspecified illicit activity; (b) had been with the bank for over three decades; and (c) one of whom had impeccable international credentials. By closing the accounts before affording Plaintiff an opportunity to explain any alleged wrongdoing disclosed to the bank by federal authorities or other sources, it acted in a reckless manner. For whatever reason, it did not conduct itself in a professional manner in terms of protecting the sterling reputation of innocent account holders, pending a thorough investigation of the alleged illicit conduct arising out of their bank accounts.

16. Based upon information and belief, BofA decided not to investigate the spurious charges because: (a) Plaintiff maintained a home outside of America where money-laundering guidelines were not as stringent as in America; (b) there were additional requirements to maintain this account since he was a politically exposed person ("PEP"), i.e., SARs would have to be prepared and sent to Treasury on a regular basis; and (c) BofA knew because monthly SARs would have to be prepared that there would be an ongoing additional administrative expense to maintain these accounts. BofA decided, and by so doing breached its covenant of good faith and fair dealing, that the less-expensive and easier path would be just to shut both accounts down without investigating the matter, and without explaining to the bank customers the reason for such urgent action.

17. At all relevant times, the bank had rational and inexpensive alternatives available to it in lieu of immediately shutting down these accounts. The bank could have, for example, granted Plaintiff and his daughter a 90-day extension period in which they could secure an alternative banking relationship without any undue pressure on them. That extension would have saved them the embarrassment of having to disclose to various banks that their accounts had been immediately shut down by BofA without any reason given for such action. It would have been much easier for the Plaintiff and his daughter to secure an alternative banking relationship if they did not need to disclose that conduct.

18. The bank could have also offered to write letters of recommendation detailing the clean account history and above-board activity of Plaintiff and his daughter for over three decades. It also could have created a plausible rationale for closing down the bank accounts, i.e., a change in bank policy concerning international customers. That again would have prevented the embarrassment and the humiliation that the Plaintiffs suffered, and the difficulty they had encountered in securing a new banking relationship.

19. Like all banks in the post-9/11 atmosphere, BofA feared that FinCEN could become involved if it continued to maintain these accounts. However, FinCEN personnel had never informed or threatened the bank with this possibility. BofA, like every bank, knows that FinCEN has an array of enforcement tools which could cripple an institution. Not concerning itself with the significant and possibly irreparable damage an abrupt shutdown of the accounts would inflict on Plaintiff and his daughter, it went ahead and shut both accounts down. It never afforded them an explanation as to its rationale in doing so, because it knew that there was no credible basis for finding that either of the Plaintiffs had engaged in any type of illicit activity.

20. Because of his sterling 34-year relationship with BofA and his international status, i.e., Plaintiff John Doe is held in high regard all over the world, BofA owed a duty to Plaintiff to investigate

6

such spurious charges and determine whether they were bona fide. It did not do so, however, not even initiating a dialogue with the entity which was the source of the allegations of wrongdoing. Plaintiff's account was closed, along with his daughter's, and they both suffered significant personal and financial injury as a direct result of BofA's negligence in failing to investigate the allegations made against him.

21. The bank compounded its negligence in not affording the Plaintiff or his daughter an opportunity to explain any wrongdoing before it rushed to shut down his account, and by failing to extend a reasonable 90-day extension to the Plaintiffs to secure a new banking relationship.

WHEREFORE Plaintiffs request entry of an order that requires BofA to explain in writing why it closed down their bank accounts at issue and Plaintiffs also request a monetary award of $250,000 to compensate them for the embarrassment, reputational damage, and business-related damages described herein.

## COUNT II: BREACH OF CONTRACT AGAINST DEFENDANT BANK OF AMERICA

22. Plaintiffs repeat and reallege paragraphs 1 through 21 as though fully recited herein.
23. When Plaintiff opened up his account at BofA 34 years ago, he had discussions with bank officials, who assured him that he would be treated with the utmost good faith in all of his transactions at the bank. He opened the account on the basis of those representations, and BofA's sterling reputation in the banking community, both for customer loyalty and for first-class banking practices. During his 34-year relationship with the bank, and consistent with those representations, bank officials stated repeatedly that they appreciated Plaintiff and his daughter banking with them, answered all of their inquiries promptly, and took care of all their banking needs in a satisfactory manner.

24. Based on the long-term banking relationships that both Plaintiffs had with BofA, Plaintiff had assumed that in the event there was a negative development of any nature concerning his or his daughter's account, for example a bounced check or a misdirected wire transfer, that the matter would be thoroughly investigated to determine whether the Plaintiffs were at fault. Plaintiff John Doe, at all times, would have been willing under such circumstances to pay for any unnecessary expenses incurred by the bank. However, he never imagined at any time that his account would be abruptly closed without any explanation beforehand as to the need of taking such a draconian measure. He also assumed in good faith that when any kind of issue arose about the nature of his banking activities, including alleged illicit activities, he would be called in before the accounts were closed to address any discrepancies or concerns the bank had about his bank account activity or his daughter's. He also assumed that a proper investigation would be initiated concerning the allegations made against him before taking any action, including suspending his banking privileges.

25. Furthermore, based upon information and belief, the terms of Plaintiff's contract with BofA were to be interpreted under either Georgia or California law. Each jurisdiction recognizes a covenant of good faith and fair dealing in banking/customer relationships.[1] That covenant would have, at a minimum, necessitated the bank: (a) starting a dialogue with the source of the allegations of wrongdoing; (b) ascertaining the bona fides of such accusations before shutting down the bank accounts; (c) calling in the Plaintiff to alert him to the nature of the accusations; and (d) starting a comprehensive investigation of the matter and issuing a report to the Plaintiff upon its completion.

26. By deciding to summarily and abruptly close both accounts because it did not want to incur the expenses associated with SAR reporting and/or feared regulatory involvement, i.e., FinCEN,

---

[1] Until the original contract is produced, BofA cannot claim that the contract did not contain a provision waiving the covenant of fair dealing.

BofA breached the covenant of good faith and fair dealing implied in its dealings and in its contracts with both Plaintiffs.

27. As a result thereof, Plaintiff and his daughter have been significantly damaged. They both have had their reputations impugned, and every time they now seek an alternative line of credit or open a new bank account, they must disclose that BofA has closed their accounts down. In these circumstances they are, in effect, required to engage in self-defamation. Plaintiff's reputation has been damaged in the international banking community, and he fears that in connection with any future governmental appointments, because this negative item will show up on his credit report, he will not be offered certain lucrative positions in the private industry and with government. Currently he sits on various boards for prestigious international corporations, and once word gets out that an international bank shut down his account for possible illicit activity, those corporations could insist that he step down.

WHEREFORE Plaintiff requests entry of an order that requires BofA to explain in writing why it closed down the bank accounts at issue and Plaintiff also requests a monetary award of $250,000 to compensate him and his daughter for the embarrassment, reputational damage, and business-related damages described herein.

### COUNT III: FALSE LIGHT INVASION OF PRIVACY AGAINST MERRILL LYNCH

28. Plaintiffs repeat and reallege paragraphs 1 through 27 as though fully recited herein.
29. Plaintiff is a PEP and a major player in the world of international politics. BofA's decision to shut down his account has affected his standing in the international banking community.
30. According to Georgia law, false light claims have five elements:
    a. False information;

    b. Depiction of the Plaintiff in an untruthful and highly offensive manner;

    c. Identification of the Plaintiff;

    d. Disclosure to the public or to a limited number of individuals in a particular field, for example, the international banking community; and

    e. The publication was the Defendant's fault.

31. Georgia courts regularly acknowledge that "the interests protected [by the tort of false light] is clearly that of reputation, with the same overtones of mental distress as in defamation. *See Association Services v. Smith*, 549 S.E. 2d 454, 459 (Ga. Ct. App. 2001).

32. Based upon information and belief, Merrill Lynch shared with BofA, other banks, and FinCEN a newspaper clipping or an OFAC internal memorandum indicating that Plaintiff was suspected of engaging in illicit activity. The newspaper clipping and other inaccurate documentation was false and defamatory, and by sharing it with other entities, Merrill Lynch published it to various third parties. Based upon information and belief, those third parties shared that information with members in the international banking community, which severely damaged Plaintiff's reputation in that community.

33. Because of Plaintiff's status as a PEP and a significant person of interest in the world of international politics, the closure of his account and the accompanying rumors of illicit activity, i.e., money laundering, have been injurious to his business reputation and have affected his standing in the domestic and international banking community.

WHEREFORE Plaintiff requests entry of an order that requires Merrill Lynch to explain in writing why it closed down the bank accounts at issue and Plaintiff also requests a monetary award of $250,000 to compensate him and his daughter for the embarrassment, reputational damage, and business-related damages described herein.

## COUNT IV: NEGLIGENCE AGAINST DEFENDANT MERRILL LYNCH

34. Plaintiffs repeat and reallege paragraphs 1 through 33 as though fully cited herein.

35. In reviewing the Plaintiff's application to open up an alternative investment account, Merrill Lynch officials received notification from an unknown source that Plaintiffs had engaged in unspecified illicit activity. Merrill Lynch decided to not investigate the issue of illicit activity, because it assumed that the Plaintiffs had engaged in such activity, even though, had it checked with BofA, it would have discovered that that was a preposterous accusation. If it did check with BofA, Merrill Lynch would have learned that the Plaintiff had a sterling reputation, and conducted his banking operations in a completely professional and transparent manner.

36. Rather than investigate the bona fides of charges of illicit behavior on the plaintiff's part, Merrill Lynch summarily decided it would not entertain doing business with the plaintiff. Plaintiff never received an explanation from Merrill Lynch officials as to why they refused to do business with him.

37. Merrill Lynch decided on its own that the Plaintiffs would not have a good explanation as to the nature of the allegations. The bank assumed Plaintiff had engaged in some illicit activity that warranted rejection of his application to open an alternative investment account. It made no effort to discern whether there was any discrepancy or issue with respect to the allegations.

38. As a result of Merrill Lynch's conduct, including the transmission of false and malicious information to BofA and other banks and federal institutions, Plaintiff must now explain why BofA eventually shut his account down, based on information received from Merrill Lynch. He and his daughter must also explain why BofA would not provide investment banking services to him despite the fact that they had a stellar 34-year relationship with the bank.

39. Given the stature of the Plaintiff, especially Plaintiff's international reputation for integrity, Merrill Lynch was obligated to investigate charges of illicit behavior lodged against Plaintiff before deciding not to do business with him or his daughter. Even though it knew the consequences of a decision not to do business with him would eventually become public knowledge, and would be per se damaging to his reputation, Merrill Lynch summarily rejected Plaintiff's application to become a customer. Merrill Lynch did not give the Plaintiff a reason for doing so, because there was no credible basis for refusing to do business with him. As a result of Merrill Lynch's conduct, Plaintiff cannot explain to an alternative bank why his account had been shut down, making it appear that he is involved in some suspicious behavior. Banks do not, as a general matter, routinely close bank accounts or refuse to do business with a customer who has an impressive personal balance sheet and an unblemished 34-year history with a major bank, BofA.

40. As a result of Merrill Lynch's conduct, Plaintiff and his daughter are now considered to be a banking customer risk. i.e., they may be viewed as having links to illicit activity abroad. The false light in which they are viewed means that, for the rest of his life, in order to secure alternative banking services, Plaintiff and his daughter will both have to disclose to the banking community that Merrill Lynch would not even do business with him. Plaintiff and his daughter have experienced serious and irreparable damages as a result of Merrill Lynch's conduct, and are viewed negatively in the international banking community today. The stigma resulting from Merrill Lynch's decision not to do business with the Plaintiff and daughter still attaches to them today, and to make matters worse, they cannot present any rationale why Merrill Lynch refused to do business with them. Therefore, until such time that Merrill Lynch explains the basis for its refusal to do business with the Plaintiff, the Plaintiff is unable to undo the significant harm that this conduct caused his reputation.

WHEREFORE Plaintiffs request that this Court issue an order that provides Merrill Lynch will render a written explanation to Plaintiffs as to why they refused to do business with him. Plaintiffs request judgment in the amount of $250,000 against Merrill Lynch for the damages resulting from the negligent conduct explained in this cause of action.

Respectfully Submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*